IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN A. MALACK; MICHAEL R. ROSATI;  :
VIRGIL MAGNON; S.S. RAJARAM M.D.;   :
HAYWARD PEDIATRICS, INC.; AND    :
HENRY MUNSTER            :   CIVIL ACTION NO. 08-0784
                           :
     v.                :
                           :
BDO SEIDMAN, LLP          :

O'NEILL, J.                                 AUGUST   3  , 2009

## MEMORANDUM

On February 15, 2008, plaintiffs John A. Malack, Michael R. Rosati, Virgil Magnon, S. S. Rajaram, M.D., Hayward Pediatrics, Inc. and Henry Munster filed a class action complaint alleging that defendant BDO Seidman, LLP violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  I have before me plaintiffs' motion for class certification, defendant's response, plaintiff's reply, defendant's surreply and plaintiff's response thereto.  Oral argument was held on July 14, 2009.

## BACKGROUND

Plaintiffs are purchasers of notes, subordinated debt securities, subordinated money-market notes and subordinated debentures (collectively, the "notes") issued by American Business Financial Services, Inc., ("ABFS") a diversified financial services organization, during the class period of October 3, 2002 to January 20, 2005.[1]  According to plaintiffs' complaint,

---

[1] On January 21, 2005, ABFS filed a petition for reorganization pursuant to Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  See In re ABFS, Inc., et al. (No. 05-10203) (MFW).  On April 1, 2005, the Bankruptcy Court authorized the Creditors' Committee to retain Special Litigation Counsel to investigate potential claims on behalf of ABFS noteholders.  On April 4, 2005, ABFS announced that it intended to

during the class period ABFS was in the business of originating, buying and securitizing or selling home mortgage loans and business loans and its customers were generally credit-impaired or subprime buyers who were not able to get loans from banks or savings and loan associations.

Plaintiffs allege that, to raise capital during the class period, ABFS used a financing technique known as a securitization. In each of its securitizations, ABFS transferred a pool of mortgage loans to a trust in exchange for certificates, notes or other securities issued by the trust that were then sold to investors for cash. Plaintiffs allege that ABFS would often retain the rights to service the loans for a fee and would retain an interest in the cash flows generated by the securitized loans (called an "interest-only strip" or "IO strip"). Because the IO strips represented expected future cash flow, if borrowers did not make payments the value of the IO strips declined. According to plaintiffs, IO strips and servicing rights were important assets and a major source of income for ABFS throughout the class period, representing approximately 58.48% and 51.60% of ABFS's assets as of year end in 2002 and 2003, respectively.

According to plaintiffs, ABFS was able to securitize most of its mortgages from January 2002 through March 2003, but investment banks refused to continue securitization of pools of ABFS mortgages beginning in the June 2003 quarter. As a result, ABFS began selling mortgages it originated for cash on a whole loan basis. ABFS obtained the money to finance its loans to home buyers or business owners by borrowing from institutions, such as banks and insurance companies, and by selling hundreds of millions of dollars of notes to class members. ABFS sold the notes, promising to pay interest at rates well above prime and without involvement of

---

wind down its operations and dispose of its assets through a Chapter 11 plan of liquidation. On May 17, 2005, the Chapter 11 bankruptcy proceeding was converted to a Chapter 7 liquidation.

underwriters or brokers.  The Notes were non-transferrable except with ABFS' permission and

noteholders could cash in the notes only upon maturity, so there was no market for their resale.

Plaintiffs allege that in purchasing Notes from ABFS during the class period they relied

upon ABFS's 2002 and 2003 registration statements and prospectuses, which included defendant

BDO's audit reports of ABFS.  Plaintiffs allege that the registration statements informed

investors that ABFS expected to pay back the notes and the promised interest, but that these

representations lacked a reasonable basis because ABFS' loan portfolio was of poor quality, the

value of the IO strips and servicing agreements was materially less than reported and ABFS'

assets and operating results were overstated.  For example, plaintiffs allege that ABFS

fraudulently altered their loan delinquency ratio by engaging in improper practices to lower

artificially the number of loans that were reported as delinquent.  For example, plaintiffs allege

that, though "delinquent loans" were defined as those loans more than thirty days past due, ABFS

would label loans as "delinquent" only after they were sixty or ninety days past due.  Plaintiffs

further allege that ABFS engaged in re-aging techniques such as forbearance and deferment

agreements in order to keep loans from being counted as delinquent.

Plaintiffs also allege that ABFS failed to state that its internal accounting controls were

weak or nonexistent.  For example, $4.8 million was at one point allocated to the wrong account.

Additionally, ABFS employees with access to the general ledger could make entries into the

accounting system with no apparent oversight, authorization or review.

Defendant BDO Seidman, LLP, a firm of certified public accountants and auditors that

provides a variety of accounting, auditing and consulting services, served as ABFS' auditor and

principal accounting firm during the class period.  By virtue of its position as an independent

accountant and auditor, defendant had access to files, key employees and ABFS' confidential

corporate financial, operating and business information, so defendant had the opportunity to

observe and review ABFS' business and accounting practices and internal control structure.

Pursuant to its agreements with ABFS, defendant was required to audit ABFS' financial

statements in accordance with generally accepted auditing standards ("GAAS") and report its

results to ABFS, its board of directors, its audit committee and the members of the investing

public, including plaintiffs.  During the class period, defendant issued unqualified opinions on

ABFS' financial statements for the 2001, 2002 and 2003 fiscal years which were included in

ABFS Registration Statements files with the SEC that became effective on October 3, 2002 and

November 7, 2003.

Plaintiffs assert that in the registration statements BDO falsely represented that its audits

of ABFS' 2002 and 2003 financial statements had been conducted in accordance with GAAS and

improperly issued "clean" or unqualified opinions or certifications that those financial statements

fairly represented ABFS' financial condition and results of operations in conformity with

Generally Accepted Accounting Principles ("GAAP").  Plaintiffs allegedly depended on the

reliability of defendants' opinions that ABFS' financial statements were fairly stated in

accordance with GAAP.  Plaintiffs allege that they could not and would not have purchased notes

without these published opinions of BDO.

## DISCUSSION

Plaintiffs seek to certify a class comprised of:

All persons who suffered damage as a result of their purchase of Notes from American
Business between October 3, 2002 and January 20, 2005 (the class period), pursuant to
the 2002 and 2003 Registration Statements, including prospectuses included as Exhibits

(the prospectuses) and all supplements thereto.

To prevail on a motion for class certification, plaintiffs must satisfy all of the requirements of Federal Rule of Civil Procedure 23(a) and the requirements of one of the subsections of Rule 23(b).  See Johnston v. HBO Film Mgt., Inc., 265 F.3d 178, 183 (3d Cir. 2001).  The four threshold requirements of Rule 23(a) are:  (1) numerosity ("the class is so numerous that joinder of all members is impracticable"); (2) commonality ("there are questions of law or fact common to the class"); (3) typicality ("the claims or defenses of the representative parties are typical of the claims or defenses of the class"); and (4) adequacy ("the representative parties will fairly and adequately protect the interests of the class").  Wetzel v. Liberty Mut. Ins. Co., 508 F.2d 239, 246 (3d Cir. 1975), cert. denied, 421 U.S. 1011 (1975).

Plaintiffs seek certification under subsection (3) of Rule 23(b), which requires "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and that a class action be "superior to other available methods for the fair and efficient adjudication of the controversy."  Fed.R.Civ.P. 23(b)(3); Amchem Prods. v. Windsor, 521 U.S. 591, 615 (1997).  The Court of Appeals has recently clarified three key aspects of class certification procedure:

> First, the decision to certify a class calls for findings by the court, not merely a "threshold showing" by a party, that each requirement of Rule 23 is met. Factual determinations supporting Rule 23 findings must be made by a preponderance of the evidence. Second, the court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits-including disputes touching on elements of the cause of action. Third, the court's obligation to consider all relevant evidence and arguments extends to expert testimony, whether offered by a party seeking class certification or by a party opposing it.

In re Hydrogen Peroxide, 552 F.3d 305, 307 (3d Cir. 2009).  "The interests of justice require that

in a doubtful case . . . any error, if there is to be one, should be committed in favor of allowing class certification" Eisenberg v. Gagnon, 766 F.2d 770, 785 (3d Cir. 1985).[2]

Predominance requires an evaluation of whether "proposed classes are sufficiently cohesive to warrant adjudication by representation." In re Hydrogen Peroxide, 552 F.3d at 310-11, citing Amchem, 521 U.S. at 623. Requiring more than a common claim, predominance requires that "issues common to the class must predominate over individual issues . . . ." In re Prudential, 148 F.3d at 313- 14. In In re Hydrogen Peroxide, the Court recognized that the Supreme Court has observed that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws" but stated that it does not follow that a court should relax its certification analysis, or presume a requirement for certification is met, merely because a plaintiff's claims fall within one of those substantive categories. In re Hydrogen Peroxide, 552 F.3d 321-22, citing Amchem, 521 U.S. at 625; Fed.R.Civ.P. 23(b)(3) advisory committee's note, 1966 Amendment, noting that "[p]rivate damage claims by numerous individuals arising out of concerted antitrust violations may or may not involve predominating common questions." "Because the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual, a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or

---

[2] While parties originally disputed whether additional discovery was required, at oral argument the parties agreed that the completed depositions and the discovery completed for the related state court action Miller v. Santilli, et al., Civil Action No. 01225 and the Pennsylvania SEC's administrative investigation, In re American Business Financial Services, LLC, Docket No. 2005-08-02, in addition to the Noteholders Litigation and the bankruptcy litigation in the related case against ABFS, constitute sufficient discovery to warrant a decision. As these depositions and discovery are relevant to this litigation and will provide a substantial factual basis for making factual determinations, I find that additional discovery is not required to make a determination on class certification under In re Hydrogen Peroxide.

individual issues predominate." In re Hydrogen Peroxide, 552 F.3d 321-22.  The "presence of individual questions . . . does not mean that the common questions of law and fact do not predominate."  Eisenberg, 766 F.2d at 786, finding that, in the context of a securities class action, even the presence of individual questions as to the reliance of each individual class member did not negate the predominance of the class' common claims.  However, more recently, the Court of Appeals noted that "[i]f proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable."  Newton, 259 F.3d at 172.  Therefore, "the task for plaintiffs at class certification is to demonstrate that [each] element . . .  is capable of proof at trial through evidence that is common to the class rather than individual to its members."  In re Hydrogen Peroxide, 552 F.3d at 311-12.  The relevant question is not whether each element can be proved but whether such proof will require evidence individual to class members.

Predominance thus requires inquiry into the merits.  See id. at 311, holding that the court must "examine the elements of plaintiffs' claim through the prism of Rule 23," internal quotation marks omitted.  Plaintiffs argue that class representatives will focus on common questions concerning, inter alia:  (1) whether the registration statements contained untrue statements of and/or omitted material facts; (2) whether defendant's unqualified audit opinions were false or baseless; (3) whether defendant violated the Securities Act of 1934; (4) whether ABFS was a Ponzi scheme and a sham business; (5) whether defendant's opinions were required for ABFS to register the notes as securities; (6) whether but for defendants' audit opinions there could have been no offering at the price at which ABFS offered the notes and (7) whether plaintiffs and class members have sustained damages and, if so, what is the proper measure of damages.

In order to establish a prima facie case of securities fraud under Rule 10b-5,  plaintiffs

7

must plead and prove:  (1) a misstatement or omission (2) of material fact (3) made with scienter

(4) on which plaintiffs reasonably relied and (5) which was the proximate cause of economic

loss.  In re Bexar County Health Facility Development Corporation Sec. Litig. (Bexar II),130

F.R.D. 602, 605 (E.D. Pa. 1990), citing Peil v. Speiser, 806 F.2d 1154, 1160 (3d Cir. 1986).

Defendant does not dispute that plaintiffs have adequately pled a misstatement or omission, its

materiality, scienter, and that such a misstatement or omission was the proximate cause of

economic loss in this case and that class issues on these aspects of the case would predominate

over individual issues by a preponderance of the evidence.  For the purpose of class certification,

the only issue of predominance that is disputed is reliance.

      Plaintiffs' reliance on the financial information for which defendant was responsible is a

necessary element of their claims under Section 10 of the 1934 Act, Gruber, 776 F. Supp. at

1046, citing Basic v. Levinson, 485 U.S. 224 (1988).  Reliance may be established either by

showing actual reliance on the material in question or by showing facts which justify a

presumption of reliance.  "Requiring proof of individualized reliance [and injury] from each

member of the proposed plaintiff class effectively would . . . prevent[ ] [plaintiffs] from

proceeding with a class action, since individual issues then would . . . overwhelm[ ] the common

ones."  Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 172 (3d Cir. 2001),

citing Basic, 485 U.S. at 242.  On the other hand, presuming these elements would resolve "the

problem of balancing the substantive requirement of proof of reliance [and injury] in securities

cases against the procedural requisites of [Federal Rule of Civil Procedure] 23."  Id., quotation

and citations omitted.  However, if the presumption of reliance is unavailable and "[i]f proof of

the essential elements of the cause of action requires individual treatment, then class certification

is unsuitable." Id., citing Binder v. Gillespie, 184 F.3d 1059, 1063-66 (9th Cir. 1999), upholding class decertification where a presumption of reliance and loss is unavailable, cert. denied, 528 U.S. 1154 (2000).

Traditionally, actual reliance is established by "proof that the misrepresentation or omission actually induced the plaintiff[s] to act differently than he would have acted in his investment decision." See St. Louis Univ. Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, 562 F.2d 1040, 1048 (8th Cir. 1977), accord Piel, 806 F.2d 1154.  Plaintiffs concede that several of the named plaintiffs have admitted that they didn't read the audits or the registration statements before purchasing the ABFS notes.  Thus, plaintiffs are not currently pursuing actual reliance as a means of certifying a class of noteholders that actually relied on the registration statements.

While reliance has steadfastly remained an essential element of a Rule 10b-5 case, "the impracticability of proving [actual] reliance in modern securities transactions has lead to the creation of certain doctrines which relax the burden of proof on reliance and allows a district court, at the class action stage, to presume reliance." In re Bexar County Health Facilities Development Corp. Sec. Litig., 1992 WL 142029, at *3 n.3 (E.D. Pa. June 16, 1992).  Plaintiffs allege that a presumption of reliance exists in this case.  Defendant claims that plaintiffs cannot satisfy the Rule 23(b)(3) predominance requirement because no class-wide presumption of reliance is available; thus, individual issues of reliance will predominate.[3]

---

[3]  While defendant also argues that issues about whether renewal investments constituted purchases will predominate, I found that renewal investments or rollovers constitute purchases for the related litigation in In re Am. Bus. Fin. Serv., Inc. Sec. Litig., 413 F. Supp.2d 378 (E.D. Pa. 2005), and I do so here consistent with the reasoning in that case.

The Supreme Court first relaxed the burden of proof of reliance in <u>Affiliated Ute Citizens</u> <u>v. United States</u>, 406 U.S. 128, 153-54 (1972), finding that positive proof of reliance is not a prerequisite to recovery; rather, "all that is necessary is that the facts withheld [i.e. the omission] be material in the sense that a reasonable investor might have considered them important in the making of [the] decision [to purchase the putative investment]."  Plaintiffs have not alleged that <u>Affiliated Ute</u> supports a presumption of reliance in this case.  In securities litigation, parties can also pursue a presumption of reliance under a "fraud on the market" theory or under a "fraud created the market" theory.

I.      <u>"Fraud on the Market" Theory</u>

As the Supreme Court has noted,

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business . . . .  Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements . . . .  The causal connection between the defendant's fraud and the plaintiff's purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

<u>Basic</u>, 485 U.S. 241-42 (1988), <u>quoting</u> <u>Peil</u>, 806 F.2d at 1160-61.  However, the "fraud on the market" theory can apply only when a stock's price accurately reflects its value because, when information flows freely and stocks trade quickly and efficiently price will closely reflect value. <u>Gruber</u>, 776 F. Supp. at 1052.  Under this theory buyers are not obliged to prove reliance on any false information because it may be assumed that they relied on the accuracy of the price and that the price reflected all of the news in the market.  If a party introduced any positive data that was false it would necessarily affect all buyers because they would all pay the fraudulently inflated price.  <u>Id.</u>

10

The "fraud on the market" theory cannot apply to an initial public offering or note that can be sold only by the promoters at the price the promoters set and which has no market value because it can be resold only to the promoters.  As there was no open and developed market for ABFS notes, the buyer cannot assume the price he pays reflects all of the information in the market.  Since plaintiffs cannot assume that the price paid represented all the information available to the market, including any errors in BDO's statements, the "fraud on the market" theory does not apply.  Plaintiffs do not dispute that the "fraud on the market" theory does not apply to this case because the notes at issue were not traded in an efficient market.

II.    "Fraud Created the Market" Theory

Instead, plaintiffs rely on the "fraud created the market" theory to establish a presumption of reliance.  The "fraud created the market" doctrine similarly relaxes the burden of proof requirements with respect to the element of reliance for newly issued securities.  The Court of Appeals for the Fifth Circuit introduced this doctrine in Shores v. Sklar, 647 F.2d 462 (5th Cir. 1981).[4]  "Fraud created the market" is a circular theory based on faith in the market itself.  The theory presumes the securities market is legitimate, and that buyers rely on its legitimacy."  Gruber, 776 F. Supp. at 1052.  The Shores doctrine presumes it is reasonable for an average

---

[4]  The fraud created the market theory is disputed among the courts which have considered it.  Its interpretation is fairly narrow in the Circuits that have expressly adopted it, including the Fifth Circuit, Shores, 647 F.2d 46; the Tenth Circuit, T.J. Raney & Sons, Inc. v. Fort Cobb, OK Irrigation Fuel Auth., 717 F.2d 1330, 1333 (10th Cir. 1983); and has been criticized by several others, including the Sixth Circuit, Ockerman v. May Zima & Co., 27 F.3d 1151, 1159 (6th Cir. 1994), declining to adopt the presumption; Eckstein v. Balcor Film Investors, 8 F.3d 1121 (7th Cir. 1993), rejecting the presumption; and a recent case in the Southern District of New York, currently on appeal to the Second Circuit, rejecting the presumption and calling into question the future of the doctrine, In re Refco, Inc. Sec. Litig., 609 F. Supp.2d 304 (S.D. N.Y. 2009).

investor to rely on a mix of factors which make up the "integrity" of the market, including the

efficiency of the market in the traditional theoretical sense, the regulatory system and the

representations of promoters of securities to preclude issuance of securities "where the promoters

knew that the subject enterprise was worthless when the securities were issued, and successfully

issued the securities only because of defendants' fraudulent scheme."  Wiley, 746 F. Supp. at

1291, citing Abell v. Potomac Ins. Co., 858 F.2d 1104, 1122-23 (5th Cir. 1988), vacated on other

grounds sub nom. Fryar v. Abell, 492 U.S. 914 (1989).  This inquiry focuses on whether the

securities were "entitled to be marketed," not merely on whether they were theoretically

marketable in a purely financial sense.  Id. at 1291, citing Abell, 858 F.2d at 1121.  As the Shores

Court noted, "[t]he securities laws allow an investor to rely on the integrity of the market to the

extent that the securities it offers to him for purchase are entitled to be in the market place."  647

F.2d at 471.  The reliance in that instance is on the securities laws and the benefits of purchasing

newly issued securities in a regulated market, rather than merely the efficiency of an open and

developed market.  Wiley, 746 F. Supp at 1291.

"[W]hile a few district courts in this circuit have discussed the theory, the Court of

Appeals for the Third Circuit has yet to rule."  Gruber v. Price Waterhouse, 776 F. Supp. 1044,

1052 (E.D. Pa. 1991); cf. Peil, 806 F.2d at 1161 n. 10, noting that, while that "fraud on the

market" applies to developed markets, it may not be "plausible . . . in the case of newly issued

stock."[5]

---

[5]  While the Bexar II Court, 130 F.R.D. at 609, held that the Court of Appeals' affirmance
without an opinion of Stinson v. Van Valley Development Corp., 719 F. Supp. 362 (E.D. Pa.
1989), constituted an adoption of the "fraud created the market" theory's economic
unmarketability test, as many issues were litigated in that case I join the majority of cases in
finding that the Court of Appeals has not yet ruled on this issue.  See e.g., Gruber, 776 F. Supp.

There are two lines of cases under which the "fraud created the market" theory has been examined:  economic unmarketability and factual, or legal, unmarketability.  All parties argue that it is immaterial under which test I analyze these issues.  Defendants argue that plaintiffs fail to adequately argue a presumption of reliance under either test; plaintiffs argue that the reliance must be presumed under both tests, I will address the issues under all tests.

A.      Economic Unmarketability Test

As my colleague Judge Ditter has noted, economic unmarketability limits the "fraud created the market" theory of reliance to "new issues" of securities and requires that plaintiffs "show that had the fraud been disclosed, the bonds could not have been marketed at any combination of price and interest."  Gruber, 776 F. Supp. at 1052-53, citing Bexar II, 130 F.R.D. at 609. (citations omitted).  Essentially, a newly issued security must be patently worthless for reliance to be presumed under the economic unmarketability test of the fraud created the market theory.

In Stinson, the plaintiffs, who had purchased bonds issued for construction of a retirement complex, sued alleging financial mismanagement in the project's planning and development. 719 F. Supp. 362.  However, the Court did not adopt their "fraud created the market" argument because the project in fact existed, noting that "even where a project was misconceived and badly managed, this alone does not amount to the kind of unmarketability warranting applicability of the fraud-created-the-market presumption."  Id. at 366.  In applying the economic unmarketability test as described in Abell, 858 F.2d at 1122-23, Stinson argued that "fraud

at 1052; Wiley v. Hughes Capital Corp., 746 F. Supp. 1264 (D. N.J. 1990); In re Hibbard,Brown Sec. Litig., 1994 U.S. Dist. LEXIS 21500, at *24 (D. N.J. Mar. 25, 1994), not for publication.

created the market" theory established reliance only if the plaintiffs could show that "the promoters knew that the subject enterprise was worthless when the securities were issued, and successfully issued the securities only because of defendant's fraudulent scheme." Id.

Similarly, in determining whether the bonds at issue in Bexar II could be marketed, the Court noted:

> The Village on the Heights project was constructed. Although occupancy rates fell behind projections, they were not insubstantial. The Trinity Foundation is in bankruptcy but will pay some return on plaintiff's investments. In other words, the bonds were not patently worthless at the time of issuance, nor was the project a sham designed from its inception to defraud the public.

130 F.R.D. at 611. Under the "fraud created the market" theory, a plaintiff's burden of proof is to show that:

> (1) the defendants knowingly conspired to bring securities onto the market which were not entitled to be marketed, intending to defraud purchasers; (2) that plaintiff[s] reasonably relied on the bond's or security's availability on the market as an indication of their apparent genuineness; and (3) as a result of the scheme to defraud, a loss was suffered.

Id. at 608, citing Shores, 647 F.2d at 469-70.

The phrase "not entitled to be marketed" makes it difficult for any security to fulfill this test as nearly any company that issues a security has some assets that could be sold and is performing some business functions that would permit some value to be attached to the security, even if not the value at which it was sold. See Wiley v. Hughes Capital Corp., 746 F. Supp. 1264, 1291-93 (D. N.J. 1990). As Judge Ditter discussed in Gruber, under the economic unmarketability line of cases, "the 'fraud created the market' doctrine cannot apply to real businesses. Even where management is thoroughly corrupt, and purposefully bankrupts a firm, the existence of an original, actual entity forecloses applying the doctrine." Gruber, 776 F. Supp.

14

at 1053.  Because the airline at issue in Gruber operated and owned "planes, hangers, and runway space, and it used these assets to carry passengers," Judge Ditter determined that it was not a sham business even if it was "a bad idea from the start" or a "great idea that poor, or even dishonest, management killed."  Id.

   In this case, plaintiffs note that ABFS "was in the business of originating, buying and securitizing or selling home mortgage loans and business loans" and that "[i]ts customers were generally credit-impaired or subprime buyers who were not able to get loans from banks or savings and loan associations."  This statement supports the proposition that ABFS was not a sham business.  ABFS originated a large number of loans and plaintiffs note that its largest asset was the interest it received on its interest-only strips which, according to defendant, generated $100 million in 2002, $160 million in 2003 and $178 million in 2004 for ABFS.  Payments are still being collected from some of the loans originated by ABFS in the Trustees' action being litigated in the bankruptcy court.  Plaintiffs argue that ABFS was improperly labeling delinquent loans out of line with accepted standards to improve their ratings which plaintiffs assert constituted fraud and that but for BDO's audit opinion approving ABFS' GAAP the notes would not have been issued.  However, assets still existed such that the notes were not patently worthless and the business was not fictional or a sham.  Though plaintiffs assert that their expert, Harris Devor, will testify that ABFS was insolvent as of 2000, for the reasons above, this does not support that ABFS and its notes were patently worthless as the company was previously a viable entity.  See Gruber, 776 F. Supp. at 1053.  As a fully operational company, though one that admittedly failed, plaintiff has failed to show that ABFS was a sham business to satisfy the economic unmarketability test.

Plaintiffs have failed to provide sufficient evidence to warrant a presumption of reliance under the economic unmarketability test of "fraud created the market" theory.

B.      Factual Unmarketability Test

1.      Factual Unmarketability

The second line of cases applies a factual unmarketability test which asks: "was the security subject to fraud so pervasive as to undermine its genuineness and render it unworthy of trading in a regulated securities market." Wiley, 746 F. Supp. at 1293.  The Wiley Court noted that "[w]hile even extraordinarily risky investments may be marketable at some combination of price and interest rate, it is inconceivable that a reasonable investor would purchase stock in a corporation that has no legitimate business purpose and which contains no assets, or the only assets of which are worthless acquisition targets owned by principles of the holding corporation." Id. at 1294.  Although Wiley discussed Judge Tjoflat's concurrence in Ross v. Bank South, N.A., 885 F.2d 723 (11th Cir. 1989),[6] as supporting factual unmarketability and defining it as requiring that the securities could not be issued at the actual price and interest price at which they were

---

[6] Judge Tjoflat stated that the Shores holding is "fundamentally flawed and should be overruled" and noted that he had dissented in Shores and continued to believe that it was wrongly decided.  Ross, 885 F.2d at 733.  However, as the majority did not explicitly address or reverse Shores, Judge Tjoflat concurred in the result of the Ross majority but wrote a special concurrence as an opportunity to re-examine Shores, to explain why he believes that Shores should be reversed and to question the majority's "reformulation of Shores." Id.  Judge Tjoflat noted that the majority's holding rested on an economic unmarketability test under which the plaintiff must show that the securities could not have been offered on the market at any price or interest rate absent the fraudulent scheme.  Id. at 735-36.  Judge Tjoflat questioned the analysis in Shores and challenged the validity of the economic unmarketability test, arguing it is theoretically possible to market nearly any security at some combination of price and interest.  Id.  Judge Tjoflat argued that even if Shores is to be followed, the appropriate test should be one of factual unmarketability under which plaintiffs must prove that absent the fraud the bonds would not have been issued at the actual price and interest rate at which they were issued.  Id.

issued, the Wiley Court's analysis required and Judge Ditter in Gruber interpreted Wiley as

requiring that the securities be worthless under the factual unmarketability test.  Wiley, 746 F.

Supp. at 1293-94; Gruber, 776 F. Supp. at 1053.  In Wiley, the Court found that "the public

offering was the product of a fraudulent scheme such that the stock would not have existed, been

issued or been purchased but for the intentionally fraudulent conduct of the [defendants]"

because:

> [The plaintiffs] have asserted there were no assets of the corporation beyond the funds
> obtained from the fraudulent issuance of Hughes Capital Securities; the acquisition
> targets are alleged to be worthless companies and Hughes Capital had not obtained letters
> of credit or other financial assistance for the alleged plan to acquire the target companies.
> Moreover, the only potential assets of Hughes Capital, the targeted acquisition
> companies, were owned or controlled by officers or directors of Hughes Capital

Wiley, 746 F. Supp. at 1294.  Thus, in Wiley, the Court found that plaintiffs presented sufficient

evidence to show that the business was worthless and had no legitimate business purpose and

denied defendants' motion for summary judgment.  In interpreting Wiley, the Gruber Court held

that because "[defendant corporation] had assets and a legitimate business purpose[, it] does not

fall within Wiley's contemplation of factual unmarketability."  Thus, it appears that the factual

unmarketability test as applied in the Third Circuit requires that the underlying entity and/or

security be totally worthless as does the economic unmarketability test.

As previously noted, the notes that ABFS offered were not entirely worthless as the

company was, as it advertised, actually offering mortgages in its Philadelphia office and bundling

these mortgages for securitization.  Though, as ABFS' registration statements noted, the ABFS

notes were risky investments,[7] if ABFS had paid off their debts and the housing bubble had not

---

[7] The 2003 ABFS Registration Statement, for example, includes the following language
disclosing the risks of investing in the notes at issue:

burst it is conceivable that ABFS could have returned to profitability and the noteholders could have received a return on their investment.  Additionally, ABFS had a legitimate business purpose:  to offer and securitize mortgages.  I make no finding on whether defendant's audit of ABFS was sufficient under the GAAS, but as ABFS notes were not totally worthless because ABFS had assets and a legitimate business purpose plaintiffs have not shown reliance under the factual unmarketability test as defined in Wiley and Gruber.

Plaintiffs allege that the factual unmarketability test applied by Wiley and the concurrence in Ross means that the security would not have been sold at the price at which it was issued but for the fraud.  Ross, 885 F.2d at 735.[8]  However, a factual unmarketability test focused

- "An investment in these securities is highly speculative and involves a high degree of risk."
- "In the event we do not generate sufficient cash flows from operations to repay the debt securities, you could lose all or part of your investment."
- "You should only invest in these securities if you can afford to lose your entire investment.  You should consider carefully the numerous risk factors and the other information set forth in this prospectus before you decide to purchase these securities."
- "If any of this information is intentionally or negligently misrepresented and such misrepresentation is not detected prior to loan funding, the value of the loan may be significantly lower than expected.  Whether a misrepresentation or fraudulent act is made by the loan applicant, the mortgage broker, another third party or one of our employees, we generally bear the risk of loss."
- "These debt securities are our unsecured obligations.  We do not contribute funds to a separate account such as a sinking fund to repay the debt represented by these securities upon maturity."

[8]  However, as discussed above, Wiley mentioned this concurrence but did not apply it or discuss actual price in its analysis.  Instead, it relied on a modified test of worthlessness which took into account that even a worthless, sham company can have some assets.  Wiley, 746 F. Supp. at 1293-94.  It stated that "even extraordinarily risky investments may be marketable at some combination of price and interest rate, [but] it is inconceivable that a reasonable investor would purchase sock in a corporation which has no legitimate business purpose and which contains no assets. . . ." Id. at 1294.

on the actual price at the time of issue would be an attempt to apply the logic from "fraud on the market" to securities not subject to market forces.  Plaintiffs' version of the factual unmarketability test would allow investors to rely on a fictional market to set the correct price for a security that is admittedly not traded on the open market and for which a market therefore cannot set a price.  The price of a newly-issued security that has no market value because it cannot be sold on the market, like the notes at issue, is set by the security's underwriters, issuers or promoters who can set the price at any amount that they believe investors will purchase the note.  Ockerman, 27 F.3d at 1159.  "These participants usually have interests different from or contrary to those of investors and their valuations, therefore, may not correspond with the security's true market value." Id.  The only way in which investors can correct for a poorly priced security that is not sold on the market is not to purchase it.  If they do not purchase it, the promoter may set the price point lower to encourage sales.  However, as this is not an open market where the price varies as to the market's knowledge about the company and its risks, each investor must make the decision as to the actual value of the note versus the price at which it is being sold by the promoter and whether this represents a good investment for that investor.  If an investor chooses to purchase a security that is not sold on the market for a price that is higher than it should be given the actual value of the security and its attendant risks, then the investor must bear those risks.  To do otherwise would be to provide investment insurance that securities not sold on the market would be sold at the market price.  This version of the factual unmarketability test attempts to apply the efficient market theory logic of the "fraud on the market" test to protect investors purchasing securities not sold on the market.  As the efficient market theory cannot apply to securities not sold on the market, this view of the factual

19

unmarketability test fails.

      2.      "Legal" Factual Unmarketability

Another interpretation of the factual unmarketability test proposed by plaintiffs, called legal unmarketability in the Court of Appeals for the Sixth Circuit, is described in T.J. Raney, 717 F.2d at 1333 and in Ockerman v. May Zima & Co., 27 F.3d 1151 (6th Cir. 1994).[9]  Legal unmarketability occurs when a regulatory or municipal agency would have been required by law to prevent or forbid the issuance of the security.  Ockerman, 27 F.3d at 1160.

In adopting the "fraud created the market" test from Shores, the Court of Appeals for the Tenth Circuit held in T.J. Raney that the securities could not have been issued but for the fraud so plaintiff had "reasonably relied on the availability of the bonds as indicating their lawful issuance" because the defendant was not a valid public trust and was actually prohibited from issuing state bonds under state law.  T.J. Raney, 717 F.2d at 1333.  As the T.J. Raney Court noted, this holding "merely extends the protection of Rule 10b-5 to those cases in which the securities were not qualified legally to be issued" but "does not imply in any way that the regulatory body considers the worth of the security or the veracity of the representations made [to the regulatory body] nor does it establish a scheme of investors' insurance."  Id., internal citations and quotation marks omitted.[10]  Thus, under T.J. Raney, a security is legally unmarketable if the

_____

[9]  Plaintiffs' reply briefs argue that this theory of factual unmarketability was described in Wiley when the court noted that the "inquiry focuses on whether the securities were 'entitled to be marketed,' not merely on whether they were theoretically marketable in a purely financial sense."  Regardless of whether legal unmarketability has been previously adopted by any court in this Circuit, plaintiffs have not established that a presumption of reliance exists under legal unmarketability here.

[10]  This parallels the Court of Appeals for the Ninth Circuit's "reliance on the regulatory process" approach applied in Arthur Young & Co. v. U.S. Dist. Ct., 549 F.2d 686 (9th Cir.

defendant is not legally entitled to offer securities and plaintiffs may rely on the availability of the bonds as evidence of their lawful issuance by an entity legally entitled to offer securities.  See id.

In Ockerman, the plaintiffs did not claim that the defendants "made misrepresentations or omissions to the issuing municipality or to a regulatory agency such that, had full disclosure been made, the governmental entity would have been required by law to deny the bonds' issuance." Ockerman, 27 F.3d at 1160.   The plaintiffs merely claimed that the registration documents did not disclose the nursing services that the defendants planned to provide and had this plan been fully disclosed the project would have been unlawful as such services were not permitted and no bonds could have been issued.  Id.  However, these nursing services were not provided because defendants complied with state laws that prohibited such services.  Id.  Therefore, the defendants' failure to disclose that they planned to provide nursing services was irrelevant because the services were not ultimately provided and the record did not support a claim that the bonds were legally unmarketable for providing unlawful nursing services.  Id.  Thus, even if there were fraud, no unlawful activity occurred to make the issuance of the bonds legally unmarketable.  Id.

Plaintiffs argue that but for defendant's audit opinion that did not disclose ABFS' allegedly fraudulent activity the SEC would not have allowed the notes to be sold; therefore, they were not legally entitled to be marketed.  Essentially, plaintiffs assert that the sale of ABFS notes would not have been possible if the allegedly adverse facts regarding the delinquency rates would have been disclosed.  Plaintiffs allege that they depended on the SEC not to permit such notes to be registered.

---

1977), cert. denied, 434 U.S. 829 (1977).

However, plaintiffs have failed to show that ABFS was not legally entitled to register its notes.  Instead, plaintiffs merely show that such notes might have been sold at a lower price if the undisclosed delinquency practices had been known to the SEC and disclosed to potential noteholders.  Even if plaintiffs' claim that ABFS did not define the delinquencies according to the standard of care and failed to disclose that fact were assumed to be true, this does not prove that the SEC would not have approved the notes or that the notes would not have been sold at the same price at which they were ultimately offered because the SEC does not guarantee the value of the securities it registers.  See T.J. Raney, 717 F.2d at 1333.  Such evidence would only support the proposition that the ABFS notes involved a potentially higher risk as the delinquency rate would allegedly be greater under the standard plaintiffs assert is more widely used in the industry.  Thus, unlike the defendants in T.J. Raney, this is not a situation where the defendant was not legally entitled to offer securities.  Additionally, plaintiffs have not shown that if the disclosure had been made issuance of such securities would have been unlawful instead of merely disclosing a potential additional risk to investors.  See Ockerman, 27 F.3d at 1160, suggesting that if the defendants had provided the unlawful services then issuance of the securities might have been unlawful.

Plaintiffs claim that the fact that the money received from noteholders in their purchase of the notes was to go primarily to paying back securitized and secondary debt meant that the notes were not entitled to be issued because such payments constitute an illegal Ponzi scheme.  However, it is difficult to see how the SEC would have not registered the notes if it had been clear that the money from the securitization was earmarked to pay back debts; ABFS' registration statements at issue clearly state that the funds are to be used "to repay existing subordinated debt

and to fund our operations, including our operating losses." 2003 ABFS Registration

Statement.[11]  As the prospectus and registration statements submitted to the SEC show that

ABFS operations were troubled and that this investment "involve[d] a high degree of risk," the

fact that the notes at issue may have resembled a Ponzi scheme, in that the proceeds were

primarily used to pay back investors in earlier offerings, does not in and of itself make the notes

not legally entitled to be marketed.  As the ABFS registration statements at issue clearly stated

that the company had lost significant funds in the previous years and acknowledged that the notes

were being offered to pay back debt from previous securitizations, it is illogical that the SEC

would be precluded from registering the statements for this reason.

Additionally, plaintiffs' argument that they relied on the regulatory agency to allow or

disallow a securities sale because of fraud is undermined by the fact that the SEC does not

endorse, or vouch for the veracity of, the documents submitted to it.  17 C.F.R. § 229.501 (1998);

see also Joseph v. Wiles, 223 F.3d 1155, 1166 (10th Cir. 2000), declining to adopt the Ninth

Circuit's "reliance on the regulatory process" reasoning in Arthur Young, 549 F.2d 686.  In fact,

as stated in the prospectus at issue, the SEC requires offerors of such securities to state that

"[n]either the Securities and Exchange Commission nor any state securities commission has

approved or disapproved of these securities or passed upon the adequacy or accuracy of this

prospectus.  Any representation to the contrary is a criminal offense." 2003 ABFS Registration

---

[11]  Specifically, the statement said that "[ABFS] estimate[s] that the net proceeds resulting
from the sale of the subordinated debt will be approximately $291.0 million net of estimated
offering expenses if we sell all of the securities we are offering thorough this prospectus.
[ABFS] intends to use approximately $210.5 million to $291.0 million of the proceeds to repay
maturing notes with maturities of one day to 10 years and interest rates ranging from 4.0% to
13.0%." Id.  The registration statement goes on to note that, of what remains after paying back
the notes of previous investors will go to pay the ABFS operating losses.

Statement; 17 C.F.R. § 229.501 (1998).  As the registration statements for the notes at issue clearly stated that the SEC had not passed upon the adequacy or accuracy of this prospectus, it would be illogical to use plaintiffs' argument to obtain a  presumption of reliance.

Thus, plaintiffs have failed to offer sufficient evidence to warrant a presumption of reliance under factual or legal unmarketability of "fraud created the market" theory and have not shown that the SEC would not have registered the notes at issue"but for" defendant's audit opinions omitting the alleged fraud.  Plaintiffs have failed to satisfy the predominance requirement of Rule 23(b)(3) by a preponderance of the evidence as to the Section 10(b) claims because the have not shown that a presumption of reliance is warranted and have not alleged an alternative theory of reliance.  Because plaintiffs have not attempted to certify a class based on actual reliance, I will not address whether such certification would be successful.  Therefore, I will deny class certification in this case.[12]

An appropriate Order follows.

_____

[12]  As I am denying plaintiffs' motion for class certification on the issue of predominance, I need not consider defendants' arguments about whether particular named plaintiffs satisfied the typicality and adequacy tests under 23(a) and whether class action was the superior method for addressing these claims under 23(b).  I will, however, note that had plaintiffs been able to show that a presumption of reliance was warranted so as to satisfy predominance the noteholders class would have fulfilled all of the factors under 23(a) and 23(b).